UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HENRY L. ROJAS, M.D., MITCHELL K.
ROSEN, M.D., and H & L ROJAS M.D., P.C.,
d/b/a/ ROJAS AND ROSEN M.D.,

Plaintiffs,

v.

CIGNA HEALTH AND LIFE INSURANCE
COMPANY, and CONNECTICUT GENERAL
LIFE INSURANCE COMPANY,

Defendants.

No. 14-CV-6368 (KMK)

<u>OPINION & ORDER</u>

---

Appearances:

Harold J. Levy, Esq.
Quadrino Law Group P.C.
Melville, NY
*Counsel for Plaintiffs*

Andrew Levchuk, Esq.
Bulkley, Richardson and Gelinas, LLP
Springfield, MA
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Defendants Cigna Health and Life Insurance Company ("Cigna") and Connecticut

General Life Insurance Company ("Connecticut General") (collectively, "Defendants") bring

these Counterclaims against Plaintiffs Henry L. Rojas, M.D. ("Rojas"), Mitchell K. Rosen, M.D.

("Rosen"), and H & L Rojas, M.D., P.C., doing business as Rojas and Rosen M.D. ("Rojas and

Rosen M.D.") (collectively ("Plaintiffs"), alleging fraud, unjust enrichment, money had and

received, and breach of contract. (*See* Am. Counterclaims (Dkt. No. 91).) Plaintiffs have moved

for summary judgment on all of Defendants' counterclaims. (*See* Dkt. Nos. 97–100.) For the

reasons to follow, Plaintiffs' Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

In resolving Plaintiffs' Motion for Summary Judgment, the Court will recite only either undisputed facts or those set forth by Defendants and supported by the record.  The Court will not, except as noted, set forth Plaintiffs' version of the facts where disputed.

Plaintiffs Henry L. Rojas, M.D., Mitchell K. Rosen, M.D., and H & L Rojas, M.D., P.C., doing business as Rojas and Rosen M.D., are a New York professional medical corporation and the practicing physicians in that medical practice.  (Pls.' Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 2–4 (Dkt. No. 99); Defs.' Resp. to Pls.' Rule 56.1 Statement ("Defs.' 56.1 Resp.") ¶¶ 2–4 (Dkt. No. 106).)  Defendants Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company ("Cigna") are nationwide health insurers, headquartered in Connecticut.  (Pls.' 56.1 ¶ 5; Defs.' 56.1 Resp. ¶ 5.)

On or around December 4, 2008, Cigna entered into a Physician IPA Services Agreement with Columbia Affiliated Physicians IPA, LLC ("Columbia IPA").  (Decl. of Andrew Levchuk ("Levchuk Decl.") Ex. 5 (the "Agreement") 10 (Dkt. No. 107).)  That agreement became effective on January 1, 2009 and has been in effect since that date.  (*Id.* at 1.)  Plaintiffs were Professional Providers under Columbia IPA, and therefore became professional providers with Cigna pursuant to the above-referenced agreement; they provided healthcare services to Cigna Plan participants, and were paid directly by Cigna for those services.  (Levchuk Decl. Ex. 2 ("O'Donnell Decl.") ¶¶ 3–4.)  Plaintiffs thereafter executed Change of Affiliation Forms with Columbia Affiliated Physicians IPA, LLC, in September 2009, which meant that Plaintiffs wished to participate in Cigna exclusively through Columbia Affiliated Physicians IPA, LLC,

and thereafter agreed that reimbursement for treatment to Cigna Plan participants would be limited to Covered Services, as defined in the Agreement. (O'Donnell Decl. ¶¶ 6, 8.)

This case centers on medical services conducted by Rojas and Rosen M.D. between October 20, 2010 and July 15, 2013. Cigna reimbursed Rojas and Rosen M.D. $844,334.52 for the services at issue. (Pls.' 56.1 ¶ 14; Defs.' 56.1 Resp. ¶ 14.)

On September 13, 2013, Dr. Daniel J. Nicoll, Cigna's National Medical Director for Fraud and Abuse, advised Plaintiffs that, pursuant to the Agreement, Cigna was "conducting a 'medical claim audit,' and requested that Plaintiffs provide patient records and comments concerning certain laboratory and electro-diagnostic testing." (Pls.' 56.1 ¶ 11; Defs.' 56.1 Resp. ¶ 11.) According to Dr. Nicoll, his "request for medical records had been prompted by the Special Investigations Unit's review of Dr. Rosen's claims and identification of the unusual amount and frequency of Dr. Rosen's submission of charges for blood tests for suspected allergies." (Levchuk Decl. Ex. 3 ("Nicoll Decl.") ¶ 5.)

According to Cigna, the problems the Special Investigations Unit discovered with the Plaintiffs' claims for reimbursements for the in vitro allergy testing were as follows. First, Cigna claims that Dr. Rojas and Dr. Rosen used the incorrect billing code for these tests. (Defs.' 56.1 Resp. ¶ 12.) Medical providers use specific codes, known as Current Procedural Technology ("CPT") codes. (Nicoll Decl. ¶ 3.) CPT codes "are a method of describing a service explicitly so that both the billing entity and the paying entity understand precisely the service provided." (*Id.* ¶ 3.) According to Cigna, the Agreement required Rojas and Rosen to use one of the two CPT codes corresponding to skin-testing, (*id.* ¶ 6), or the one CPT code that is typically used by healthcare providers who bill blood tests for suspected allergies, (*id.* ¶ 9). Indeed, Defendants contend that the code under which Plaintiffs billed Cigna for the test conducted did not actually

reflect the testing done, as the code reflected complement testing, while the test performed was a complement antigen test, not just a complement test, which included the testing of both IgG, an Immunoglobulin, and complement. (Defs.' 56.1 Resp. ¶¶ 69, 71; *see also* Levchuk Decl. Ex. 8 ("Piquette Report") 1–2.)[1]

Defendants also claim that Dr. Rojas and Dr. Rosen billed the same 132-panel test repetitively on multiple occasions for seven patients, as opposed to subsequently conducting more focused testing after receipt and review of the initial test results. (*See* Nicoll Aff. ¶ 10.) This, Defendants claim, was surprising because it "would have expected to see either no subsequent testing of the same blood panel test if the initial test results had been negative, or more focused allergy testing if the initial test results had been positive, rather than the same panel of 132 suspected allergies[,]" and because Plaintiffs "always billed the same panel test for their patients, which would not seem to account for variations in clinical history of each individual plaintiff." (Levchuk Decl. Ex. 7 ("Canto Decl.") ¶ 5.)

Additionally, Defendants claim that Plaintiffs' allergy testing practices violated their policies. Specifically, Cigna almost exclusively requires the much cheaper skin allergy tests to be conducted, and only allows for in vitro allergy testing under "very restricted circumstances, such as for patients who have severe skin conditions, who cannot be withdraw[n] from medications that interfere with skin testing, who have a clinical history of high risk of anaphylaxis for skin testing, or who have mental or physical impairments." (*Id.* ¶ 6.) According

---

[1] This phrase is explained in Defendants' Counterclaims. "Complement, in immunology, is part of a complex system of more than 30 proteins that act in concert to help eliminate infectious microorganisms. The proteins work with the immune system and play a role in the development of inflammation." (Am. Counterclaims ¶ 39.) Blood testing for complement components measures the activity of nine major proteins that make up the complement system and "may be used to monitor patients with an autoimmune disorder and to see if treatment for their condition is working, or to diagnose the cause of immunodeficiency." (*Id.* ¶ 40.)

to Cigna, had Rojas and Rosen M.D. conducted skin testing and billed the skin testing correctly, the practice would have been reimbursed a total of $1,784.64 to $2,147.64 per 132-panel allergy test; instead, Rojas and Rosen M.D. billed $7,920.00 for each 132-panel in vitro allergy test. (Nicoll Decl. ¶ 6.) In fact, it was later discovered that Plaintiffs had purchased the test kits from Brendan Bioscience, LLC for between $425 and $500, but had billed Cigna for $7,920—a price mark-up of approximately 1700%. (*See* Levchuk Decl. Ex. 13 ("Rosen Dep.") at 131–32, 152–53; Nicoll Decl. ¶ 5.)

Plaintiffs responded to the September 13, 2013 request for information about these billing and claim practices on September 16, 2013. (Pls.' 56.1 ¶ 11; Defs.' 56.1 Resp. ¶ 11.) Dr. Nicoll reviewed Plaintiffs' response, and he determined that Plaintiffs had violated the billing and claims practices for the reasons discussed above. (*See* Nicoll Decl. ¶¶ 6–9.) Dr. Nicoll then wrote to Plaintiffs on October 18, 2013, listing areas of concern in Plaintiffs' billing practices and stating that "[f]ailure to cooperate [with Cigna's Quality Management and Utilization Management programs] will result in termination of the Cigna contracts for [Plaintiffs]." (Pls.' 56.1 ¶ 13; Defs.' 56.1 Resp. ¶ 13.)

On or around November 7, 2013, Cigna wrote to Plaintiffs and demanded a repayment for the entire amount paid for the services at issue, $844,334.52. (Pls.' 56.1 ¶ 14; Defs.' 56.1 Resp. ¶ 14.) That letter stated that a medical claim audit determined that Plaintiffs' practice was overpaid in the amount of $844,334.52 and requested that Plaintiffs reimburse Cigna for the claims paid "in error." (Pls.' 56.1 ¶ 14.)

Then, on June 23, 2014, William J. O'Donnell, Vice President of Network Management for Cigna, informed Plaintiffs in writing that it was terminating the Agreement with Rosen and Rojas M.D. effective August 22, 2014 due to "[a] consistent pattern of providing services not

consistent with our standards of medical necessity and a billing pattern that does not accurately reflect the actual services provided." (Pls.' 56.1 ¶ 24; Defs' 56.1 Resp. ¶ 22.) Plaintiffs did not appeal the termination, but rather chose to file this Action. (Defs' 56.1 Resp. ¶ 22.) According to Plaintiffs, the Agreement was not terminated due to fraud, but was merely done based upon Plaintiffs' failure to reimburse Defendants pursuant to the Agreement. (Pl.'s 56.1 ¶ 22.) Plaintiffs note that the official reason given for the termination was "[a] consistent pattern of providing services not consistent with our standards of medical necessity and a billing pattern that does not accurately reflect the actual services provided." (*Id*. ¶ 24 (emphasis and internal quotation marks omitted).) Defendants dispute this characterization, arguing that fraud was indeed the core reason for termination. Defendants note that they had previously filed a fraud report with the New York Department of Insurance on November 15, 2013, (*see* Canto Decl. ¶ 9; Ex. A ("Fraud Referral")), which was based on Plaintiffs' alleged misrepresentation of services rendered pursuant to the Agreement, (Fraud Referral). This misrepresentation of services was the fraud, as Defendants allege that the use of CPT Code 86160 "was a misrepresentation," because that Code "did not describe the test the doctors were actually performing." (Defs.' 56.1 Resp. ¶ 22. (citations and internal quotation marks omitted).)

B.  Procedural History

Plaintiffs initiated this Action by filing a Complaint on August 11, 2014. (Compl. (Dkt. No. 1).) However, before Defendants filed an Answer, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction on August 22, 2014, requesting that Defendants be enjoined "from retaliating against [Plaintiffs] by terminating their long-time in-network provider agreements and ejecting them from Defendants' provider network for asserting their ERISA rights." (Mem. of Law in Supp. of Pls.' Mot. for Temp. Restraining Order and Prelim. Inj. ("Pls.

TRO Mem.") 1 (Dkt. No. 6).)[2] Defendants filed their Opposition papers on August 22, 2014 as well, (Dkt. Nos. 9–12), and Plaintiffs filed their Reply on September 10, 2014, (Dkt. No. 26). In the interim, Defendants filed their Answer and Counterclaims on September 3, 2014. (Answer (Dkt. No. 18).)

The Court held a preliminary injunction hearing on September 15, 2014, (*see* Dkt. (minute entry for Sept. 15, 2014)), wherein the Court denied Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction on the record. (*See* Order (Sept. 16, 2014) (Dkt. No. 29).) On September 17, 2014, Plaintiffs filed an interlocutory appeal of the September 16 Order. (Dkt. No. 31.) On October 14, 2014, the Second Circuit denied Plaintiffs' Motion for a Preliminary Injunction. (2d Cir. Order (Oct. 14, 2014) (Dkt. No. 39).) On October 7, 2015, the Second Circuit affirmed the Court's dismissal of Plaintiffs' claims on the grounds that Plaintiffs did not have standing under ERISA. *See Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015).

The Court thereafter held a conference on March 2, 2016, (*see* Dkt. (minute entry for Mar. 2, 2016)), and set a discovery schedule, (Dkt. No. 53), which was revised on November 7, 2016, (Dkt. No. 61). On July 6, 2017, the Court held a conference wherein Defendants were instructed to file amended counterclaims. (*See* Dkt. (minute entry for July 6, 2017).) Defendants filed their Amended Counterclaims on July 27, 2017, (Am. Counterclaims (Dkt. No. 91)), and Plaintiffs filed their Answer on August 17, 2017, (Dkt. No. 92). On October 24, 2017, Plaintiffs

---

[2] A hearing on Plaintiffs' Order to Show Cause for temporary relief was initially held before Judge Katherine Polk Failla on August 18, 2014. (*See* Dkt. (minute entry for Aug. 18, 2014).) At this hearing, Judge Failla so-ordered a stipulation wherein the Parties agreed to the temporary relief sought by Plaintiffs pending the preliminary injunction hearing. (*See* Pls.' Mot. for Temp. Restraining Order and Prelim. Inj. ("Pls.' Mot.") 1 (Dkt. No. 5).) Defendants were then ordered to file their Opposition by August 22, 2014. (*Id.* at 2.) The case was then transferred to this Court on August 18, 2014 for further proceedings. (Dkt. No. 3.)

filed a pre-motion letter seeking to file a motion for summary judgment, (Dkt. No. 93), to which Defendants responded on November 1, 2017, (Dkt. No. 94). The Court held a pre-motion conference on November 7, 2017, (*see* Dkt. (minute entry for Nov. 7, 2017)), where it set a briefing schedule, (Mot. Scheduling Order (Dkt. No. 96)). Plaintiffs filed their Motion for Summary Judgment and accompanying papers on January 12, 2018. (Dkt. Nos. 97–100.) Defendants filed their Opposition and accompanying papers on March 9, 2018, (Dkt. Nos. 106–08), and Plaintiffs filed their Reply and accompanying papers on April 4, 2018, (Dkt. Nos. 111–13).

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted). However, a district court should consider "only evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements

'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

Plaintiffs have moved for summary judgment on Defendants' fraud, unjust enrichment, and money had and received claims, arguing that each is redundant and barred by Defendants' breach of contract claim.  Additionally, Plaintiffs claim that all of Defendants' counterclaims are preempted by ERISA.  The Court will address these issues in turn.

1.  Fraud Counterclaim

a.  Fraud Arising Out of a Breach of Contract

Defendants claim Plaintiffs committed fraud, because Plaintiffs "knowingly and recklessly made misrepresentations and omitted material facts in each of the claims submitted to Cigna . . . [,] which would have raised questions about the medical necessity of the medical treatments allegedly provided."  (Am. Counterclaims ¶¶ 77–78.)  To demonstrate fraud, Defendants must prove "(1) a misrepresentation or a material omission of fact which was false and known to be false by [Plaintiffs], (2) [that] the misrepresentation was made for the purpose of inducing [Defendants] to rely upon it, (3) justifiable reliance . . . , and (4) injury." *JAF Partners, Inc. v. Rondout Sav. Bank*, 898 N.Y.S.2d 496, 497 (App. Div. 2010) (internal quotation marks omitted).  Plaintiffs argue that Defendants' fraud counterclaim is duplicative of their contract claims, and that Defendants fail to prove each element of fraud by clear and convincing evidence.  (Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Mem.") 5–16 (Dkt. No. 98).)

"Under New York law, no fraud claim is cognizable if the facts underlying the fraud relate to the breach of contract." *Auerbach v. Amir*, No. 06-CV-4821, 2008 WL 479361, at *5

(E.D.N.Y. Feb. 19, 2008) (internal quotation marks omitted); *see also Kriegel v. Donelli*, No. 11-CV-9160, 2014 WL 2936000, at *13 (S.D.N.Y. June 30, 2014) ("Under New York law, a fraud-based claim must be sufficiently distinct from a breach of contract claim where it stems from an alleged breach of contract." (alterations and internal quotation marks omitted)).  The Second Circuit has held that, where fraud claims are brought alongside contract claims, the fraud claim may only proceed where it will "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted); *see also Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (same); *Gutkowski v. Steinbrenner III*, 680 F. Supp. 2d 602, 614 (S.D.N.Y. 2010) (noting that "where a fraud claim arises out of the same facts as a plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract . . . , the fraud claim is redundant and plaintiff's sole remedy is for breach of contract" (internal quotation marks omitted)); *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010) ("A fraud claim will not survive if it merely restates a claim for breach of contract.  Even a deliberately false statement that the defendant intends to perform on a contract, when he does not, will not suffice." (citation omitted)).

"A plaintiff may . . . bring parallel fraud and breach of contract claims when there are misrepresentations of present facts made post-contract formation that are collateral or extraneous to the contract."  *U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*, 230 F. Supp. 3d 253, 260 (S.D.N.Y. 2017) (alterations and internal quotation marks omitted); *see also Minnie Rose LLC v. Yu*, 169 F.

Supp. 3d 504, 520 (S.D.N.Y. 2016) (same); *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Inv. Ltd.*, No. 00-CV-9214, 2003 WL 1751780, at *8 (S.D.N.Y. Apr. 1, 2003) ("Misrepresentations made after a contract is entered into which relate to a present fact that would exist if the contract were performed, are collateral or extraneous to the contract . . . , and are actionable in fraud."); *Int'l Elecs., Inc. v. Media Syndication Glob., Inc.*, No. 02-CV-4274, 2002 WL 1897661, at *2 (S.D.N.Y. Aug. 17, 2002) (holding that the plaintiff's fraud claim was not precluded were "the[] injuries flowed not from any failure by [the defendant] to do what it contracted to do, but from its related but nevertheless distinct deception" wherein the defendant, *inter alia*, was "misleading [the] plaintiff into believing that [the defendant] was discharging its obligations" under the contract); *see also Val Tech Holdings, Inc. v. Wilson Manifolds, Inc.*, 990 N.Y.S.2d 379, 383 (App. Div. 2014) ("[The] [d]efendant does not allege merely that [the] plaintiff entered into the contract while misrepresenting its intent to perform as agreed. Rather, [the] defendant, alleges that, after the contract was made, [the] plaintiff repeatedly misrepresented or concealed existing facts concerning [the] plaintiff's performance thereunder. The fraud counterclaim thus alleges wrongful conduct and injurious consequences independent of those underlying the breach of contract counterclaim." (citation omitted)); *Kosowsky v. Willard Mountain, Inc.*, 934 N.Y.S.2d 545, 548 (App. Div. 2011) (same); *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 682 N.Y.S.2d 505, 507 (App. Div. 1998) (same).

Here Defendants allege "misrepresentations and omissions of material facts in claims submitted by Dr. Rosen, Dr. Rojas, and Rojas [and Rosen M.D.]," (Am. Counterclaims ¶ 69), that are separate and apart from Plaintiffs' failure to "adhere[] to Cigna's coverage policy and the terms of the Agreement," (*id.* ¶ 49). The crux of this claim is that Plaintiffs surreptitiously "submitted numerous claims to Cigna for use of an experimental and unproven blood test for

IgG," along with a test for "complement," none of which was covered by the Agreement between the Parties, (*id.* ¶ 37), and did so by billing Defendants for those tests at "a markup of approximately 1700%," (*id.* ¶ 50). As such, Plaintiffs not only failed to abide by their contractual agreement to "not charge . . . for a service that is not Medically Necessary," (Agreement § 3.6), and to only seek reimbursement for "Covered Services," (Am. Counterclaims ¶¶ 12–13), but also "actively concealed the actual price of [the test] each time they sent . . . [bills]," by charging Defendants at a price rate of 17 times the actual cost of the services rendered, *Minnie Rose LLC*, 169 F. Supp. 3d at 521. Not only did Plaintiffs allegedly make misrepresentations as to the actual cost of the tests, (Am. Counterclaims ¶ 50), but they also allegedly misrepresented what tests they were actually conducting by using a certain CPT Code—86160—which did not cover testing for IgG or testing for "complement" related to allergies, (*id.* ¶¶ 46–48, 67). Plaintiffs allegedly ran these tests under this CPT Code "repetitively for the same patient rather than subsequently conducting more focused testing after receipt and review of the initial test results," (*id.* ¶ 66), "which had the effect of circumventing [Defendants'] claims systems and processors and allowed [Plaintiffs] to submit such a large number of non-medically necessary claims over such an extended period of time," (*id.* ¶ 55). Thus, Plaintiffs "did more than conceal a mere failure to perform a contractual obligation[,] because [Plaintiffs] made affirmative misrepresentations of facts that would have existed if the contract were performed," *Minnie Rose LLC*, 169 F. Supp. 3d at 520, and therefore Defendants have stated a separate fraud claim based on Plaintiffs "repeatedly misrepresented or concealed existing facts" post-contract formation, *Eagle Comtronics, Inc.*, 682 N.Y.S.2d at 507. *See also Int'l Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 238 (S.D.N.Y. 2007) ("It may be possible that a false statement with respect to one purchase order was 'collateral or extraneous'

to a subsequent purchase order."); *Jordan (Bermuda) Inv. Co. Ltd.*, 2003 WL 1751780, at *8 (finding a fraud claim distinct from a breach of contract claim where the defendant agreed in the contractual agreement not to borrow money when investing, but repeatedly did so post-contract formation and intentionally concealed those investments from the plaintiff); *Minnie Rose LLC*, 169 F. Supp. 3d at 509, 521 (holding that the fraud claim was distinct from the breach of contract claim where the defendant "actively concealed the actual price" from the plaintiff, which in turn artificially inflated the commission the defendants charged the plaintiff). Accordingly, Plaintiffs' alleged misrepresentations as to the nature and cost of the tests are "collateral or extraneous" to the Agreement and are therefore properly brought as claims for fraud.

Moreover, Defendants allege that "[i]n New York, a laboratory must directly bill the costs of the test to the patient without markup by the provider ordering the test." (Am. Counterclaims ¶ 51 (citing N.Y. Public Health Law §§ 586–587)). Indeed, New York prohibits "health services purveyor[s] [from] participat[ing] in the division, transference, assignment, rebate, or splitting of fees with any clinical laboratory . . . ." N.Y. Comp. Codes R. & Regs. tit. 10, § 34-2.3(b). By charging Defendants a markup of approximately 1700% the cost of the test, Plaintiffs are alleged to have violated an independent legal duty, as they were required by New York law to "directly bill the costs of the test to the patient without a markup by the provider ordering the test." (Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n") 13 (Dkt. No. 108).) Therefore, Plaintiffs' alleged failure to comply with a legal duty separate from their contractual obligations to Defendants provides additional reason to find Defendants' fraud claim distinct from the breach of contract claim. *See Waverly Properties, LLC v. KMG Waverly, LLC*, 824 F. Supp. 2d 547, 565 (S.D.N.Y. 2011) ("[B]ecause [the plaintiff] has demonstrated the existence of a legal duty to comply with the Building Code separate from its contractual

obligation to do so, the [d]efendants are not entitled to summary judgment to the extent that [the plaintiff's] claims for negligence, gross negligence, and fraudulent and/or negligent misrepresentation arise out of the [d]efendants' alleged failure to adhere to that Code."); *Great Earth Int'l Franchising Corp. v. Milks Dev*., 311 F. Supp. 2d 419, 425–26 (S.D.N.Y. 2004) (holding that a fraud claim was not duplicative of a breach of contract claim where the defendant was alleged to have violated an independent regulatory obligation to exclude certain ingredients from its products and thereafter deliberately mislabeled the product).

### b. Proof Requirement of the Fraud Counterclaim

"Each element [of a fraud claim] must be proven at all stages, including at summary judgment, by clear and convincing evidence." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 561 (E.D.N.Y. 2010); *see also Woo v. Times Enter., Inc.*, No. 98-CV-9171, 2000 WL 297114, at *4 (S.D.N.Y. Mar. 22, 2000) ("At the summary judgment stage, a party must proffer enough proof to allow a reasonable jury to find by clear and convincing evidence the existence of each of the elements necessary to make out a claim for fraud in the inducement." (internal quotation marks omitted)). "Clear and convincing evidence is evidence that makes the fact to be proved highly probable." *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 595–96 (E.D.N.Y. 2000) (internal quotation marks omitted). This means that fraud "will not be assumed on doubtful evidence or circumstances of mere suspicion." *Fire & Cas. Ins. Co. of Conn. v. 2207 7th Ave. Rest. Corp.*, No. 03-CV-4739, 2004 WL 1933781, at *3 (S.D.N.Y. Aug. 30, 2004) (quoting *Brayer v. John Hancock Mut. Life Ins. Co.*, 179 F.2d 925, 928 (2d Cir. 1950)). "Clear and convincing evidence may, however, be circumstantial, even on summary judgment." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009). "As the moving party, [Plaintiffs] have the

burden of demonstrating an absence of clear and convincing evidence substantiating [Defendants'] claims." *Id.*

### i.  Material Misstatements

"To satisfy the first element of common law fraud, [Defendants] must show by clear and convincing evidence that [Plaintiffs] made a material false representation." *Id.* at 220.  Here, Defendants have put forth ample evidence that Plaintiffs represented to Defendants that CPT Code 86160 properly described the test being conducted, but that this CPT Code was in fact improperly used to justify payments.  According to Brent Dorval, the former part-owner of Brendan Bioscience, the creator of the complement antigen test performed by Plaintiffs, the test was intended to measure two factors:  IgG and complement or immune complex.  (*See* Levchuk Decl. Ex. 11 ("Dorval Dep.") at 29–30.)  Plaintiffs used this complement antigen test to test for food sensitivity, which can be covered by the term "food allergy."  (Rosen Dep. at 62–64.) However, Dr. Jonathan Bayuk, Defendants' medical expert, has testified that the measurement of IgG and complement, both separately and together, "has no clinical value," (Levchuk Decl. Ex. 10 ("Bayuk Dep.") at 21), and that the testing conducted by Plaintiffs had no "medical basis whatsoever in the diagnosis, investigation of symptomatology or treatment of any medical condition," (Levchuk Decl. Ex. 9 ("Bayuk Report") at 1).  Specifically, Dr. Bayuk testified that both antigens and complement "ha[ve] nothing to do with allergy," as "antigen is a . . . substance, usually foreign, that activates an immune response," and "[a] complement is an immune-activated process," but allergy is "an infectious process" and not related to immune responses.  (Bayuk Dep. 84.)

Moreover, even absent Dr. Bayuk's testimony that Plaintiffs were seeking payment from Defendants for testing that had no medical value, Defendants note that CPT Code 86160 does not

reflect the test that was conducted.  Dr. Dan Nicoll, Cigna's National Medical Director for Fraud, has testified that CPT Code 86160 does not describe the test the doctors performed.  Indeed, according to Dr. Nicoll, CPT Code 86160 is "a rarely used code," (Decl. of Harold J. Levy, Esq. ("Levy Decl.") Ex. 2 ("Nicoll Dep.") at 157 (Dkt. No. 100)), and was only "payable when it's being used to work up an immune deficiency syndrome as, you know, lupus and other things when there's a question of whether complement is a mediator or a deficiency complement is a cause of some immune deficiency syndromes or immune syndromes," (*id.* at 189; *see also id.* "[CPT Code 86160] is . . . a measure of the amount of complement, of an individual component with complement.").  Dr. Nicoll, after "read[ing] the letters, the material [Plaintiffs] submitted to [him]," and after reviewing "the medical records [Plaintiffs] sent to [him]," determined that CPT Code 86160 was "the wrong CPT code."  (*Id.* at 95–96.)  In fact, based on Dr. Nicoll's understanding of the test being conducted, he believes that "CPT code 86160 was a misrepresentation," because "the English definition of the code doesn't conform to what [Plaintiffs] did."  (*Id*. at 125.; *see also id.* at 150 ("Q.  Is your evidence that 86160 is the wrong code, is that anecdotal?  A.  I speak English and it's written in English.").

Defendants' coding expert, Laura Piquette ("Piquette"), has reaffirmed this determination, stating that "[t]he use of CPT code 86160 is incorrect as it covers only one part of the Complement Antigen Test . . . but does not include testing of IgG."  (Piquette Report 1.)  That part of the test was covered is inadequate, because the CPT Manual "requires that clinicians select the name of the procedure or service that accurately identifies the service performed," and not one "that merely approximates the service provided."  (*Id.* at 2 (internal quotation marks omitted).)  Because, according to Piquette, the complement antigen test was "not found within the . . . manual under a specific code," Plaintiffs were required to use code 86849 for "unlisted

immunology procedure," and "the use of any other code [would be] incorrect." (*Id.*) Indeed, Plaintiffs' own coding expert, Ms. Damaris Ramirez ("Ramirez"), testified that the CPT Code 86160 only described "part of what [Plaintiffs] did," but that because Plaintiffs were "testing both complement and IgG, there's no one code that covers th[e] [test]." (Levchuk Decl. Ex. 14 ("Ramirez Dep.") at 65–66.) Thus, according to Ramirez, Plaintiffs' complement antigen test fell under two CPT Codes—86160 and 86001—and thus there would still be a dispute as to whether CPT Code 86160 was in fact a misrepresentation of the testing done by Plaintiffs in order to receive payment from Defendants.

Finally, Plaintiffs do not contest that they purchased the test kits from Brendan Bioscience, LLC for between $425 and $500, (Rosen Dep. 131–32), but billed Cigna for $7,920—a price mark-up of approximately 1700%, (*see id.* at 151–52; Nicoll Decl. ¶ 5). It is also not contested that Plaintiffs never informed Defendants of the true cost of the test, and in fact represented to Defendants that $7,920 was the true cost of the services being provided. Such differences as to the cost of the tests to Plaintiff versus the amount charged to Defendants are sufficient to serve as a material misrepresentation of fact. A jury, taking the evidence most favorably to Defendants, could readily find that Plaintiffs misled Defendants about the true cost of the services being rendered in order to receive improper payments. *See Connecticut Gen. Life Ins. Co. v. True View Surgery Ctr. One, LP*, 128 F. Supp. 3d 501, 514 (D. Conn. 2015) (finding misstatements wherein the defendant failed to "disclos[e] a waiver of cost-share requirements," and submitted "charges grossly in excess of the amounts quoted" to "sufficiently state false representations"); *Oxford Health Plans (N.Y.), Inc. v. BetterCare Health Care Pain Mgmt. & Rehab, PC*, 762 N.Y.S.2d 344, 345–46 (App. Div. 2003) (finding fraud adequately stated where

the claims "are sufficiently premised on affirmative misrepresentations" as to billing for services not actually rendered and non-medically necessary services).

### ii.  Intent To Defraud

"Intent to defraud can be generally shown by evidence of guilty knowledge or willful ignorance."  *M & T Mortg. Corp.*, 736 F. Supp. 2d at 565 (internal quotation marks omitted). Courts routinely allow parties to rely on circumstantial evidence and legitimate inferences therefrom to meet this burden, as there is usually not direct evidence of fraudulent intent.  *See Hilton Hotels Corp.*, 528 F. Supp. 2d at 222–23 (citing cases).  For example, the "strong inference of fraudulent intent" may be shown by evidence of the defendants' "motive and opportunity to commit fraud" or "conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Here, intent may be inferred based on Plaintiffs' undisputed knowledge that they were charging Defendants more than seventeen times the cost of the test to Plaintiffs.  New York prohibits "health services purveyor[s] [from] participat[ing] in the division, transference, assignment, rebate, or splitting of fees with any clinical laboratory . . . ,"  N.Y. Comp. Codes R. & Regs. tit. 10, § 34-2.3(b), but nonetheless Plaintiffs generated and split profits with Brendan Bioscience, (*see* Dorval Dep. 69–73).  Moreover, Plaintiffs were aware that they were charging a 1700% price markup, which itself can be inferred to have been done to intentionally mislead Defendants into paying more than was required.  Additionally, taking all inferences in favor of Defendants, Plaintiffs knew that the CPT Code 86160 only covered complement testing, not complement antigen testing, (*see* Ramirez Dep. 65–66), but chose to use that code to ensure payment.  Plaintiffs' contention that their office manager, Gerri Cullen ("Cullen"), testified that

19

she was instructed to use CPT Code 86160 by the manufacturer, (*see* Levy Decl. Ex. 4 ("Cullen Dep.") 57), and that she confirmed this code with Cigna, (*id.* at 57–58), does not disturb this inference. That is because Cullen did not actually ask Defendants whether the compliment antigen test was covered by CPT Code 86160, nor did she even mention the underlying test; rather, Cullen merely confirmed that CPT Code 86160 was a covered service. (*Id.* at 57–58.) Moreover, CPT Code 86160 was provided to Plaintiffs—who submitted the codes themselves, (*see* Rosen Dep. 57)—and to Cullen by the manufacturer of the test, Brendan Bioscience, (*id.* at 57–58), which would in turn be a beneficiary of Plaintiff's deliberate misuse of the CPT Coding system by way of Plaintiffs' profit sharing, (*see* Dorval Dep. 69–73). Accordingly, a jury could readily infer that Plaintiffs intentionally misrepresented the testing done in order to fall within a covered service, which in turn allowed for them to recoup profits in excess of seventeen times the cost of the test itself.

### iii. Reasonable Reliance

"[Defendants] must demonstrate not only that they relied on the misstatements or misrepresentations, but that such reliance was both justifiable and reasonable." *M & T Mortg. Corp.*, 736 F. Supp. 2d at 567; *see also Hilton Hotels Corp.*, 528 F. Supp. 2d at 228 ("Under New York law, a plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it." (internal quotation marks omitted)). Plaintiffs make no arguments in their briefing as to the reasonableness of Defendants' reliance on the use of CPT Code 86160 or the reasonableness of Defendants' reliance on Plaintiffs not engaging in price markups on the complement antigen test. (*See* Pls.' Mem. 7–15.) Defendants, on the other hand, note that they expressly relied on: "1) electronic health insurance claim forms submitted by

Plaintiffs; 2) Plaintiffs' good faith and truthfulness in submitting those claims; and 3) Plaintiffs' compliance with New York law and the canons of medical ethics."  (Defs.' 56.1 Resp. ¶ 49.)  That Defendants did not review Plaintiffs' patient or medical records does not undercut the reasonableness of Defendants' reliance on Plaintiffs' statement, as the actual facts of the tests— *e.g.*, that the test cost Plaintiffs nearly $7,000 dollars less than the price billed to Defendants and that the test was not an immunological test under CPT Code 86160—was information "peculiarly within the knowledge of [Plaintiffs]."  *Hilton Hotels Corp.*, 528 F. Supp. 2d at 228 (internal quotation marks omitted).  Moreover, Defendants *did* undertake the process of "prosecuting an investigation," *id.* (internal quotation marks omitted), which in fact led to Defendants uncovering the extent of the alleged fraud here.  Thus, as Plaintiffs have not contested that there is a triable issue of fact as to Defendants' reliance allegations, these allegations would be sufficient to survive summary judgment on this issue.

### iv.  Damages

Finally, the fourth element of a common law fraud claim requires a showing that Defendants were damaged by the alleged fraudulent statements.  *See Abernathy-Thomas Engineering Co.*, 103 F. Supp. 2d at 595 (listing elements).  Defendants allege that Plaintiffs' fraudulent claim submissions caused Defendants to overpay Plaintiffs in the amount of $844,334.52, (Pls.' 56.1 ¶ 14), which was later determined to be $915,070, (Am. Counterclaims ¶ 70).  Plaintiffs do not dispute that this was the amount paid, nor do they dispute that Defendants have not been reimbursed, (*id.* ¶ 72), although Plaintiffs clearly dispute whether or not the payments were proper, as that is the essence of this dispute.  Accordingly, there is a triable issue of fact as to Defendants' damages allegations, and therefore these allegations are sufficient to survive summary judgment.

<u>2. Unjust Enrichment and Money Had and Received Counterclaims</u>

As a general rule, the existence of a valid contract renders unjust enrichment and money had and received unavailable as a remedy. *See Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *see also Arbitron, Inc. v. Kiefl*, No. 09-CV-4013, 2010 WL 3239414, at *7 (S.D.N.Y. Aug. 13, 2010) ("Unjust enrichment is not available where there is a valid contract between the parties covering the same subject matter."); *AngioDynamics, Inc. v. Biolitec, Inc.*, 606 F. Supp. 2d 300, 305 (N.D.N.Y. 2009) ("Because the dispute is covered by [a] contract, a claim in unjust enrichment cannot proceed."); *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-CV-2800, 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) ("[D]ecisions both in New York state courts and in [the Southern District of New York] have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute . . . .").

The Court recognizes that, under Federal Rule of Civil Procedure 8(d), a plaintiff, or a counterclaimant, can plead in the alternative such that the claimant can challenge the validity of the contract and allege unjust enrichment. *See Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999) ("[Rule 8(d)] offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as we must do in reviewing orders granting motions to dismiss."). However, where the validity of a contract that governs the subject matter at issue is not in dispute, and in fact the claimant alleges breach of the contract, the claimant cannot plead unjust enrichment in the alternative under New York law. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d

573, 586–87 (2d Cir. 2006) (noting that an unjust enrichment claim cannot be pled in the alternative when there is a "valid and enforceable contract governing . . . [the] . . . subject matter"); *King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.*, No. 09-CV-3980, 2009 WL 5033960, at *7 (S.D.N.Y. Dec. 23, 2009) ("Unjust enrichment may be plead in the alternative where the plaintiff challenges the validity of the contract; it may not be plead in the alternative alongside a claim that the defendant breached an enforceable contract."), *aff'd*, 396 F. App'x 736 (2d Cir. 2010); *see also Sikarevich Family L.P. v. Nationwide Mut. Ins. Co.*, 30 F. Supp. 3d 166, 172 (E.D.N.Y. 2014) (dismissing unjust enrichment claim, plead in the alternative with a breach of contract claim, because the plaintiff did not challenge the insurance policy at issue); *Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009) (dismissing unjust enrichment claim, plead in the alternative, noting that "[the plaintiff's] failure to allege that the contracts at issue are invalid or unenforceable precludes it . . . from seeking quasi-contractual recovery for events arising out of the same subject matter."); *AngioDynamics*, 606 F. Supp. 2d at 305 (dismissing unjust enrichment counterclaim, plead in the alternative, "[b]ecause the dispute [at issue] [was] covered by the [undisputed] contract, [meaning a] claim in unjust enrichment [could not] proceed").  Because no Party challenges the existence or validity of the Agreement, (Pls.' 56.1 ¶¶ 6–9; Defs.' 56.1 Resp. ¶¶ 6–9; Pl.'s Reply in Supp. of Mot. for Summ. J. ("Pl.'s Reply") 8 (Dkt. No. 26)), and the Agreement governs the payments at issue, Defendants' unjust enrichment counterclaim is dismissed.

### 3.  ERISA Preemption

"Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the

Federal courts.'" *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C.

§ 1001(b)). "To establish a 'uniform regulatory regime over employee benefit plans,' and 'to

ensure that employee benefit plan regulation is exclusively a federal concern,' ERISA includes

expansive pre-emption provisions." *Arditi v. Lighthouse Int'l*, 676 F.3d 294, 299 (2d Cir. 2012)

(quoting *Davila*, 542 U.S. at 208). ERISA provides that it "shall supersede any and all State

laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C.

§ 1144(a). In addition, § 502(a) of ERISA establishes a comprehensive civil enforcement

scheme to further the goal "of creating a comprehensive statute for the regulation of employee

benefit plans." *Davila*, 542 U.S. at 208 (internal quotation marks omitted). This scheme, which

permits certain parties to seek certain remedies, would be "completely undermined if ERISA-

plan participants and beneficiaries were free to obtain remedies under state law that Congress

rejected in ERISA." *Id.* at 208–209 (internal quotation marks omitted). Thus, a state law claim

that "duplicates, supplements, or supplants the ERISA civil enforcement remedy" is preempted.

*Id.* at 209.

The analysis of whether a claim is preempted by ERISA starts with the "presumption that

Congress does not intend to supplant state law." *Stevenson v. Bank of N.Y., Co.*, 609 F.3d 56, 59

(2d Cir. 2010) (internal quotation marks omitted). "Courts are reluctant to find that Congress

intended to preempt state laws that do not affect the relationships among" "the core ERISA

entities: beneficiaries, participants, administrators, employers, trustees and other fiduciaries, and

the plan itself." *Gerosa v. Savasta & Co.*, 329 F.3d 317, 324 (2d Cir. 2003). On the other hand,

"state laws that would tend to control or supersede central ERISA functions—such as state laws

affecting the determination of eligibility for benefits, amounts of benefits, or means of securing

unpaid benefits—have typically been found to be preempted." *Id.*

There are two independent principles of ERISA preemption: (1) express preemption under ERISA § 514 and (2) complete preemption under ERISA § 502(a). *See Wurtz v. Rawlings Co., LLC et al.*, 761 F.3d 232, 238 (2d Cir. 2014). Plaintiffs do not differentiate between the two in their briefing, but instead merely argue that any state-law cause of action brought by Defendants that "duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." (Pls.' Mem. 19 (emphasis omitted) (quoting *Davila*, 542 U.S. at 209).) Accordingly, the Court will address the two forms of ERISA preemption in turn.

### a. Express Preemption

"Express preemption is one of 'three familiar forms' of ordinary defensive preemption (along with conflict and field preemption)." *Wurtz*, 761 F.3d at 238 (quoting *Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 273 (2d Cir. 2005)). "It occurs when 'Congress . . . withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision.'" *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

As previously explained, "ERISA § 514(a) states that it shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. Thus, a claim is preempted if it relates to the plan, or involves the issue of a member[']s rights or benefits under a plan." *Connecticut Gen. Life Ins. Co. v. Advanced Chiropractic Healthcare*, 54 F. Supp. 3d 260, 264–65 (E.D.N.Y. 2014) (internal quotation marks omitted); *see also Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 114 (2d Cir. 2008) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983)); *Wurtz*, 761 F.3d at 240

(recognizing that "ERISA expressly preempts any state law that relates to any employee benefit plan" (alterations and internal quotation marks omitted)).

However, the Second Circuit has recognized that Congress did not intend "to foreclose every state action with a conceivable effect upon ERISA plans," but rather, the intention was "to maintain exclusive federal control over the regulation of such plans." *Geller v. Cty. Line Auto Sales, Inc.*, 86 F.3d 18, 22 (2d Cir. 1996) (internal quotation marks omitted); *see also Advanced Chiropractic Healthcare*, 54 F. Supp. 3d at 265 (same); *Mortg. Lenders Network USA, Inc. v. CoreSource, Inc.*, 335 F. Supp. 2d 313, 324 (D. Conn. 2004) (same). Thus, certain state law claims are not preempted by ERISA. For example, in *Geller*, the Court found that a fraud claim under New York state law survived preemption because, "although the defendants improperly administered the plan, the essence of the plaintiffs' fraud claim does not rely on the . . . plan's operation or management." *Geller*, 86 F.3d at 23. Instead, "[t]he 'bare bones' of the claim [were] that 1) the defendants fraudulently misrepresented that [an individual] was a full-time employee and 2) in reliance on the defendants' representation, the plaintiffs paid out more than $104,000 on her behalf." *Id.* Thus, in *Geller*, the "plan was only the context in which this garden variety fraud occurred." *Id.*; *see also Advanced Chiropractic Healthcare*, 54 F. Supp. 3d at 268 (finding no express preemption where the insurance company was "not a plan participant or beneficiary for whom ERISA was enacted to protect, but the insurance company trying to recoup money paid for unnecessary treatment," and the actions complained of therefore did not "concern[] the 'operation or administration' of an ERISA plan"); *In re SmithKline Beecham Clinical Labs., Inc. Lab. Test Billing Practices Litig.*, 108 F. Supp. 2d 84, 111 (D. Conn. 1999) (noting that in *Geller*, the state law claim was not preempted because it "did not rely on the pension plan's operation or management," and that the "plan was only the context in which the

garden variety fraud occurred" (alteration and citations omitted)).  Furthermore, *Geller* noted that

preemption would undermine the purpose of ERISA in certain cases that implicate "the honest

administration of financially sound plans," as opposed to claims regarding the very *existence* of

an ERISA plan.  86 F.3d at 23 (internal quotation marks omitted).

As noted, Plaintiffs do not differentiate between the counterclaims with regard to their

preemption argument.  (Pls.' Mem. 19–21.)  However, the Court's analysis applies equally to

each of the remaining claims.  Defendants note that "[t]he essence of the misconduct alleged . . .

is that [Plaintiffs] deliberately used a CPT Code that did not describe the test they performed, . . .

used an experimental test for diagnostic purposes, and . . . submit[ed] claims to Cigna for

approximately 1700% of the cost of the test to [Plaintiffs]."  (Defs.' Opp'n 21.)  Accordingly,

Defendants argue that their state law claims do not require "interpret[ation] of the terms of the

. . . benefit plans," nor do the claims "undermine any of ERISA's objectives."  (*Id.*)  The Court

agrees.  The crux of the Defendants' counterclaims is that the Plaintiffs made

"misrepresentations and omitted material facts" that implicate "the medical necessity of the

medical treatments" provided by Plaintiffs, (Am. Counterclaims ¶¶ 77–78), which resulted in

"pa[yments] [of] claims for services that were not covered . . . and [in] amounts far in excess of

the actual cost of the test to [Plaintiffs]," (*id.* ¶ 83; *see also* ¶ 95).  Essentially, Defendants' claim

boils down to whether they were "duped into paying for medical treatment" based on alleged

misrepresentations to induce excess billing at a 1700% markup for the services rendered.

*Advanced Chiropractic Healthcare*, 54 F. Supp. 3d at 268; *see also Connecticut Gen. Life Ins.

Co. v. True View Surgery Ctr. One, LP*, 128 F. Supp. 3d 501, 517 (D. Conn. 2015) (concluding

that a state law claim was not preempted by ERISA because "the claim center[ed] on whether the

surgical centers . . . misrepresented the value of their services in order to induce Cigna into

paying higher reimbursement amounts," and thus "[t]he crux of the state . . . claim is . . . the . . . billing practices—and not the terms of the ERISA-governed plans").  Moreover, much like in *Geller*, Defendants' state law claim helps to "insur[e] the honest administration of financially sound plans," *Geller*, 86 F.3d at 23, which "works to protect the interests of participants and their beneficiaries in employee benefit plans," *True View Surgery Ctr. One, LP*, 128 F. Supp. 3d at 517.

"While the Court is mindful that the definition of 'medically necessary' is relevant is deciding the legitimacy of [Defendants'] claims, the essence of the claim is fraud, and mere involvement of the definitions of the terms does not implicate [ERISA] so as to warrant preemption." *Advanced Chiropractic Healthcare*, 54 F. Supp. 3d at 268.  The existence of any ERISA plan here serves only as a backdrop; it is effectively the context for "garden variety fraud." *Geller*, 86 F.3d at 23.  Thus, there is no express preemption in this case.

### b.  Complete Preemption

Complete preemption allows for a "state cause of action [to] be recast as a federal claim for relief." *Wurtz*, 761 F.3d at 238 (alterations and internal quotation marks omitted).  "In concluding that a claim is completely preempted, a federal court finds that Congress desired not just to provide a federal defense to a state law claim but also to replace the state law claim with a federal law claim and thereby give the defendant the ability to seek adjudication of the claim in federal court." *Id.* (internal quotation marks omitted).  "This does not mean simply that Congress intended the federal court to adjudicate a state law claim; rather, when a claim is completely preempted, 'the law governing the complaint is exclusively federal.'" *Id.* at 238–39 (quoting *Vaden v. Discover Bank*, 556 U.S. 49, 61 (2009)).

In *Davila*, the Supreme Court established a two-part test to determine whether a cause of action is completely preempted by ERISA. A claim is completely preempted where: (1) "an individual, at some point in time, could have brought [her] claim under ERISA § 502(a)(1)(B)," and (2) "no other independent legal duty . . . is implicated by a [party's] actions." 542 U.S. at 210. The Second Circuit has clarified that under the first prong of *Davila*, courts should consider: (1) "whether the plaintiff is the *type* of party that can bring a claim pursuant to § 502(a)(1)(B)," and (2) "whether the *actual claim* that the plaintiff asserts can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 328 (2d Cir. 2011). The *Davila* test "is conjunctive; a state-law cause of action is preempted only if both prongs of the test are satisfied." *Id.*

While the Parties fail to address this point, it is clear that Defendants are not the type of party that can bring a claim under § 502(a)(1)(B), and therefore the first prong of the *Davila* test would not be satisfied. Section 502(a)(1)(B) permits a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Here, Defendant is not a participant or beneficiary, and therefore its claim does not fall within the scope of § 502(a)(1)(B).

Indeed, the only section which could possibly apply to Defendants is § 502(a)(3), which permits a "participant, beneficiary or fiduciary" to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain the appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). ERISA defines a fiduciary as one who "exercises any discretionary authority or discretionary control respecting management

of [a] plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). It also includes one who has "any discretionary authority or discretionary responsibility in the administration of [a] plan." *Id.* The Parties do not brief this question, but appear to assume that the first prong has been satisfied, and focus almost entirely on whether there is a duty independent of ERISA. (Pls. Mem. 19–21; Defs.' Opp'n 21–25.)

Nonetheless, regardless of whether the first prong has been met, the second prong has not, and thus *Davila*'s preemption requirements have not been satisfied. Defendants' claims rest on allegations that Plaintiffs made "misrepresentations and omitted material facts" that implicate "the medical necessity of the medical treatments" provided by Plaintiffs, (Am. Counterclaims ¶¶ 77–78), which resulted in "pa[yments] [of] claims for services that were not covered . . . and [in] amounts far in excess of the actual cost of the test to [Plaintiffs]," (*id.* ¶ 83; *see also* ¶ 95). The duty to provide truthful and proper claims submissions does not hinge on the terms of any ERISA plans. Rather, "there is an 'independent duty,' beyond any obligation under the Plans that requires the . . . medical service providers to submit honest and accurate claims to the . . . insurer." *Advanced Chiropractic Healthcare*, 54 F. Supp. 3d at 270; *see also Trustees of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002) (finding that there is a "separate and distinct duty" to not make material misrepresentations on claims submissions forms regardless of the existence of an ERISA plan); *Aetna Health Inc. v. Health Goals Chiropractic Ctr., Inc.*, No. 10-CV-5216, 2011 WL 1343047, at *6 (D. N.J. Apr. 7, 2011) (holding that "an independent legal duty existed between [the insurer] and [the provider], . . . [which] prohibited [the provider] from committing fraud or submitting fraudulent claims").

It is true that "the question of what payments would have been justified may require consultation of the plans themselves," but it cannot be said that the counterclaims are "based on

no duties independent of ERISA or plan terms." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 121 F. Supp. 3d 950, 968 (C.D. Cal. 2015); *see also Geller*, 86 F.3d at 23 (holding that a claim is not preempted where it "does not rely on the . . . plan's operation or management" and where the plan "was only the context in which this garden variety fraud occurred"); *Ass'n of New Jersey Chiropractors v. Aetna, Inc.*, No. 09-CV-3761, 2012 WL 1638166, at *7 (D.N.J. May 8, 2012) (holding that an insurer's fraud counterclaims were not preempted because those claims were "based upon an independent duty . . . under . . . [the] common law" to not "submit[] fraudulent bills to an insurer for payment"). Indeed, as the Court has previously noted, Plaintiffs had a separate duty to "submit honest and accurate claims to the . . . insurer." *Advanced Chiropractic Healthcare*, 54 F. Supp. 3d at 270. Similarly, Plaintiffs had a duty to abide by the Agreement, which is distinct from the obligation to conform with any ERISA plan. The Agreement may relate to the plan, and reference to the plan may be required, but the "plan's operation or management" is not implicated by the Parties' obligation to conform to the Agreement's terms. *See Pascack Valley Hosp. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 402 (3d Cir. 2004), *as amended* (Dec. 23, 2004) (finding that while the plaintiff's claims "exist 'only because' of that [ERISA] plan," they were nonetheless "predicated on a legal duty that is independent of ERISA," in that case a contractual agreement and a dispute over proper payment for services rendered); *Blue Cross of California v. Anesthesia Care Assoc. Med. Grp., Inc.*, 187 F.3d 1045, 1047, 1051–52 (9th Cir. 1999) (holding that claims asserted by health care providers against a health care plan for breach of their provider agreements were not completely pre-empted under ERISA, notwithstanding "the fact that these medical providers obtained assignments of benefits from beneficiaries of ERISA-covered health care plans.").

Accordingly, the counterclaims survive the second prong of *Davila* and are not completely preempted.

### III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is granted in part and denied in part. Defendants' unjust enrichment and money had and received counterclaims are dismissed. The Court will hold a status conference on November 8, 2018 at 10:00 am to discuss the remaining breach of contract and fraud claims. The Clerk of Court is respectfully directed to terminate the pending Motions. (Dkt. No. 97.)

SO ORDERED.

Dated: September 28, 2018
       White Plains, New York

                                                  _____
                                                  KENNETH M. KARAS
                                                  UNITED STATES DISTRICT JUDGE